UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| TERRY ROBERT SHIREY,<br><br>    Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION,<br><br>    Defendant. | CASE NO. 5:21-CV-00137-SO<br><br>JUDGE SOLOMON OLIVER, JR.<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

Plaintiff Terry Robert Shirey filed a Complaint against the Commissioner of Social Security (Commissioner) seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). On January 19, 2021, pursuant to Local Civil Rule 72.2, this matter was referred to a Magistrate Judge for preparation of a Report and Recommendation, and was subsequently reassigned to me pursuant to General Order 2021-06. (Non-document entry of May 25, 2021). Following review, and for the reasons stated below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

Mr. Shirey filed for DIB on March 7, 2019, alleging a disability onset date of July 30, 2018. (Tr. 122-23). His claims were denied initially and on reconsideration. (Tr. 122-31, 133-42). He

1

then requested a hearing before an Administrative Law Judge. (Tr. 157-58). Mr. Shirey

(represented by counsel), and a vocational expert (VE) testified at a hearing before the ALJ on

April 2, 2020. (Tr. 95-121). On April 13, 2020, the ALJ issued a written decision finding Mr.

Shirey not disabled. (Tr. 79-91). The Appeals Council denied Mr. Shirey's request for review,

making the hearing decision the final decision of the Commissioner. (Tr. 1-6; *see* 20 C.F.R.

§§ 404.955, 404.981). Mr. Shirey timely filed this action on January 18, 2021. (ECF #1).

Factual Background

I.     Administrative Hearing

The following summarizes the testimony of Mr. Shirey and VE Lynn Smith during the

hearing before the ALJ.

Mr. Shirey graduated high school and lives with his girlfriend of 23 years. (Tr. 101-02,

112). He has his driver's license, but does not drive long distances. (Tr. 102, 112). He is on blood

pressure medication, Meloxicam for pain, vitamin D supplements, and a topical anti-inflammatory

cream. (Tr. 102). He had previously taken other medications, but the side effects were "too much"

and he asked to discontinue them. (Tr. 102-03). He still occasionally has problems with his blood

pressure; when it gets high, he "can get a little light-headed" and must sit down until the feeling

subsides. (Tr. 103). This happens about twice per month. (*Id.*).

Mr. Shirey has pain in his knees, neck, and both shoulders. (Tr. 103-04). He also has carpal

tunnel in both hands. (Tr. 107-08). Mr. Shirey rates his shoulder pain as the worst, comparatively.

(Tr. 104). He describes it as "it starts out like pins and needles" and within "15, 20 minutes, it feels

like my shoulders are on fire." (Tr. 106). The pain comes on with simple tasks such as holding the

steering wheel while driving a car. (*Id.*). If Mr. Shirey stands for more than five or ten minutes, his

2

left leg goes completely numb. (*Id.*). It is difficult for Mr. Shirey to sit in a chair; due to his back pain, he sits in a recliner with his legs elevated. (*Id.*). Mr. Shirey spends 80 percent of the day in the recliner. (Tr. 110). Mr. Shirey cannot sleep in a bed and sleeps in the recliner instead. (Tr. 109). He estimated that he only gets four to five hours of sleep per night. (*Id.*).

Mr. Shirey is not able to pay attention to the television shows. (Tr. 113). He listens to the radio for "background noise." (*Id.*). Mr. Shirey does not socialize with anyone other than his girlfriend and her parents. (Tr. 113-14).

He wears braces on both knees every day. (Tr. 103, 108). Mr. Shirey trips and falls because he doesn't realize when he is not picking up his feet. (Tr. 108-09). He has fallen in the shower. (Tr. 111). Every two hours, Mr. Shirey's girlfriend calls to make sure he has not fallen and hit his head. (Tr. 112). Mr. Shirey has refused narcotics, but uses a topical cream to relieve his pain. (Tr. 104). He previously saw a chiropractor and received acupuncture treatments; Mr. Shirey did not receive benefit from these services. (Tr. 104-05). Mr. Shirey testified his chiropractor was concerned at the muscle spasms exhibited during examination and sent Mr. Shirey to a neurologist. (Tr. 107). He has not had injections for the pain, and doctors have not discussed surgery with him. (Tr. 105).

Mr. Shirey had last worked in 2018 as a finance manager. (Tr. 110). Mr. Shirey testified that his employers were initially "pretty good" about accommodating him when he needed to take a day off or leave early because of pain. (Tr. 111). Other past employers had not been so accommodating. (*Id.*). However, he lost this job when the owners closed the business. (Tr. 110-11).

VE Smith then testified. The ALJ first presented a light exertional hypothetical: an individual who can lift, carry, push, and pull 20 pounds occasionally and ten frequently; this individual can sit for six hours, stand and/or walk for six hours in a normal workday; cannot climb

ladders, ropes, or scaffolds, and can occasionally climb ramps and stairs; frequently balance and crouch; occasionally stoop, kneel, and crawl; occasionally reach overhead bilaterally; frequently handle and finger bilaterally; and must avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery. (Tr. 115-16). The VE testified such an individual could perform Mr. Shirey's past jobs of finance manager, office manager, and account specialist. (Tr. 116).

The ALJ asked a second hypothetical based on the limitations of the first hypothetical, but reducing lift, carry, push, and pull to ten pounds occasionally and five pounds frequently; and reducing stand and walk down to two hours in a normal workday. (*Id.*). VE Smith indicated the office manager position would be eliminated because of the exertional level, but that the hypothetical individual could still work as a finance manager or account specialist. (Tr. 117).

The ALJ's third hypothetical was an individual limited by pain and pain behavior such that the individual needed to switch positions frequently and was off-task 33 percent of the workday on an ongoing basis. (Tr. 117-18). VE Smith testified that, based on her experience, no jobs would be available with that percentage of off-task time. (Tr. 118). In her professional opinion, employers only tolerate off-task behavior no more than ten percent. (Tr. 118-19). Similarly, no work would be available in the national economy if the individual needed to be absent from work one day per week on an ongoing basis. (Tr. 119). Employers only tolerate one day per month absent, no more. (*Id.*).

The ALJ's last hypothetical limited the earlier restrictions—either one or two—and further restricted sitting to no more than three hours total, and reduced standing and walking to one hour total in five-minute increments. (*Id.*). The VE testified that the individual could not perform past

4

work or any other work, because that restriction does not meet the minimum requirement for competitive employment. (*Id.*).

Mr. Shirey's attorney asked the VE a hypothetical limiting the individual to occasional handling and fingering. (Tr. 120). The VE responded that no work would be available for such an individual. (*Id.*).

## II.   PERSONAL AND VOCATIONAL EVIDENCE

Mr. Shirey was 49 years old at the time of his alleged onset date, and 51 years old at the time of the administrative hearing. (Tr. 97, 122). Mr. Shirey completed twelfth grade and had additional vocational training up to grade 14. (Tr. 101, 130). In the past, Mr. Shirey has been employed as an office manager, finance manager, and account specialist. (Tr. 90).

## III.   RELEVANT MEDICAL EVIDENCE

**Veteran's Affairs Treatment Facilities.**

On July 18, 2018, Mr. Shirey presented for a physical therapy consult with Marsha Levenson, a physical therapist. (Tr. 377-78). Ms. Levenson noted that Mr. Shirey's most recent flare-up for his low back pain was in January or February of 2018. (Tr. 378). Mr. Shirey described his pain as ranging from a five out of ten to a ten out of ten. (*Id.*). Bending forward makes the pain worse. (*Id.*). Ms. Levenson noted Mr. Shirey had a long history of chiropractic care that "has created certain fears of movement and using modalities such as heat/TENS unit." (*Id.*). Mr. Shirey was only using meloxicam for the pain. (*Id.*). Ms. Levenson noted Mr. Shirey has modified independence with his activities of daily living, but has an extensive amount of pain when performing his activities of daily living. (*Id.*). His goals were to reduce back pain and increase his ability to do more activities around the house. (*Id.*).

On examination, Mr. Shirey exhibited increased pain with repeated motions in all direction. (Tr. 379). Strength testing was limited and joint mobility testing was not done due to Mr. Shirey's pain. (*Id.*). Mr. Shirey's gait was slow, mildly antalgic, and he used a cane. (Tr. 380). He was able to transfer independently, but was unable to lie supine for more than one-and-a-half minutes. (Tr. 380). Ms. Levenson assessed Mr. Shirey has having decreased lumbar range of motion, decreased core/lower extremity strength, poor posture, and severe kinesiophobia. (*Id.*). Ms. Levenson assessed Mr. Shirey's prognosis as "fair" and "poor" due to apprehension, severe kinesiophobia, and chronic pain at multiple body parts. (*Id.*). Ms. Levenson recommended therapy one to two times per week for eight to ten visits. (Tr. 380-81).

On July 25, 2018, Mr. Shirey met with Dr. Shah complaining of bilateral knee pain, right worse than left. (Tr. 374). His gait was antalgic. (Tr. 376). Bilateral anterior drawer, MacMurry's, posterior drawer, varus and valgus stress tests were all negative. (*Id.*). Dr. Shah recommended continuing physical therapy and a consult with an orthotist for bilateral knee neoprene sleeves with patellar cutout. (Tr. 377).

On July 27, 2018, Mr. Shirey attended physical therapy. (Tr. 373). At the appointment, Mr. Shirey reported difficulty lying on his back, but he was less sore in his hip flexors. (*Id.*). Ms. Levenson noted decreased mobility at posterior thoracic musculature and hypomobility in the joints of Mr. Shirey's thoracic spine. (*Id.*).

During physical therapy sessions on August 17, 21, and 24, 2018, , Mr. Shirey had soreness, limiting the exercises he could perform, although he exhibited good effort. (Tr. 495-98). He had severe difficulty with shoulder flexion due to avoiding arm elevation with fear that it might

increase his pain. (Tr. 496). On August 21, 2018, Ms. Levenson trialed a hot pack during the session to help Mr. Shirey improve his fear of hot products on his back. (Tr. 497).

On August 27, 2018, Mr. Shirey met with Dr. Shah for follow up after physical therapy. (Tr. 489-92). At this visit, Mr. Shirey rated his knee pain at four out of ten. (Tr. 491). His gait was antalgic. (Tr. 491). Bilateral anterior drawer, MacMurry's, posterior drawer, varus and valgus stress tests were all negative. (*Id.*). He was recommended to continue with physical therapy and discontinue Tylenol. (Tr. 492). Physical therapy notes from the same day indicate that Mr. Shirey was sore after having walked over 5,000 steps on Friday night and 10,000 steps on Saturday night. (Tr. 494). Mr. Shirey was provided with a left knee brace, but instructed to only wear it as needed for increased pain with activity, and not to wear it on a regular basis. (*Id.*).

On August 29, 2018, Mr. Shirey presented for a pain consult with Dr. Elias Veizi. (Tr. 365-68). Mr. Shirey reported he has had low back pain all his life, located at his beltline. (Tr. 366). Mr. Shirey attributed the pain to repeated lifting of heavy objects while in the military. (Tr. 372). Mr. Shirey reported the area outside his hips was numb. (Tr. 366). He reported the pain is worse when doing any type of physical activity, but alleviated by leaning forward. (*Id.*). However, pushing a shopping cart or lawnmower, or driving, creates a painful "ice pick" sensation. (Tr. 369). Over the last year, Mr. Shirey reported having left arm pain. (Tr. 366). Mr. Shirey reported having two episodes when the pain was so bad he could not walk. (Tr. 369). After one incident, Mr. Shirey reported seeing a chiropractor with benefit. (*Id.*).

Dr. Veizi observed that Mr. Shirey had a grossly normal, non-antalgic gait, with minimal pain behaviors during examination. (Tr. 367). Mr. Shirey's spinal range of motion was minimally limited; palpation revealed mild tenderness in the lower lumbar spine. (*Id.*). X-rays from July 16,

7

2018 showed congenital incomplete fusion of the right transverse process of the first lumbar level. (*Id.*). Lumbar vertebral height and sacroiliac joints were maintained, but there was disc space narrowing at L6-S1. (*Id.*). There were osteophytes and facet arthropathy. (*Id.*). Chronic mild wedging of the last thoracic vertebral body and mild scoliosis with pelvic tilt was present. (*Id.*). There was vascular calcification, facet arthropathy, and scoliosis in the cervical spine. (*Id.*). Shoulder X-ray showed that joint spaces and alignment was maintained, with no fracture seen. (*Id.*).

Dr. Veizi indicated the imaging "appears to be normal with minimal degenerative changes in the cervical spine and lumbar spine." (*Id.*). Dr. Veizi indicated the presentation appears to be a discogenic type of pain and that flexion-based exercises, with strengthening of the paravertebral muscles, is usually the treatment of choice and recommended for low back pain. (*Id.*). The neck and arm pain appeared to have a radicular component, but Dr. Veizi stated he "will not treat at this time as symptoms are not stable and appear only occasionally." (Tr. 368). As for the shoulder pain, Dr. Veizi noted X-rays appeared normal and Mr. Shirey had no limitation in his range of motion. (*Id.*). Dr. Veizi indicated it could be mild severity limits tendinitis. (*Id.*). He recommended naproxen when necessary and continuing with physical therapy. (*Id.*). No further follow-up was necessary unless there were changes in the nature or severity of symptoms. (*Id.*).

Mr. Shirey also met with pain psychologist Jamie Huckins-Barker, Ph.D. (Tr. 368). Dr. Huckins-Barker noted that Mr. Shirey had little insight into how his stressors and his behavior can affect his pain. (Tr. 372). However, Mr. Shirey was minimally open to that discussion and was ambivalent about working with mental health providers; Mr. Shirey prefers medical and physical interventions. (*Id.*). Dr. Huckins-Barker diagnosed Mr. Shirey with adjustment disorder with mixed

8

emotional features. (*Id.*). Mr. Shirey declined follow-up with pain psychology due to the drive. (*Id.*).

Mr. Shirey indicated he was going to look into outpatient mental health services at the Akron

clinic. (*Id.*).

On August 30, 2018, Ms. Levenson noted that the physical therapy session was limited due

to buckling of Mr. Shirey's knee and increase in pain. (Tr. 480). She discussed with Mr. Shirey that

his shoulder impairments appeared to be based in endurance and postural dysfunction. (*Id.*).

On September 5, 2018, Mr. Shirey demonstrated difficulty activating minute and lower

trapezius for all shoulder exercises, contributing to his symptoms. (Tr. 479). Ms. Levenson noted

pain continued to be Mr. Shirey's most limiting factor, but was improved when he put effort into

the exercises without commenting on later soreness. (*Id.*). Mr. Shirey was provided with pain

science booklets and worksheets to complete at home. (*Id.*).

On September 12, 2018, Mr. Shirey indicated increased pain due to a six-hour driving trip;

he was a passenger, but needed to take multiple breaks due to back pain. (Tr. 363). Mr. Shirey

reported his legs felt stronger, but had only minimal change in his shoulder. (*Id.*). Ms. Levenson

assessed Mr. Shirey as continuing to demonstrate increased endurance and requiring minimal

breaks. (Tr. 364). She noted muscle twitching on the left and overcompensation of the upper

trapezius, stating that overactivation is suspected to contribute to Mr. Shirey's current

presentation. (*Id.*). She encouraged Mr. Shirey to continue to do deep breathing and exercises at

home. (*Id.*).

Physical therapy discharge notes from September 14, 2018, indicated Mr. Shirey had

presented to physical therapy with low back pain, neck/shoulder pain, and right knee pain. (Tr.

360-61). Mr. Shirey reported that physical therapy had been "very helpful." (Tr. 361). He still had

some pain but felt he could better manage the pain and continue to progress. (*Id.*). The physical therapist noted Mr. Shirey exhibited increase in strength and understanding of how to manage chronic pain. (*Id.*). Mr. Shirey continued to have some tingling in the neck and shoulder region. (*Id.*). Ms. Levenson indicated Mr. Shirey may benefit from acupuncture or comprehensive treatment to manage his pain. (*Id.*). Mr. Shirey was discharged from physical therapy to a comprehensive exercise program and recommendation for a consult to acupuncture. (*Id.*).

On October 17, 2018, Mr. Shirey presented to Dr. Shah with antalgic gate and bilateral knee pain rated at a three on a ten-point scale. (Tr. 349-56). Dr. Shah noted Mr. Shirey complained of "minimal pain located at bilateral knees." (Tr. 355). The pain was intermittent, but aggravated by crawling and kneeling; sometimes more pain with walking or taking the stairs. (*Id.*). Notes indicate Mr. Shirey exhibited appropriate judgment, normal mood with good eye contact, and appropriate affect. (Tr. 350). Bilateral anterior drawer, MacMurry's, posterior drawer, varus and valgus stress tests were all negative. (Tr. 353). Dr. Shah indicated a diagnosis of bilateral knee osteoarthritis and bilateral knee patella femoral stress syndrome. (Tr. 351). Dr. Shah prescribed diclofenac topical gel to be applied to his bilateral knees as needed, and meloxicam for pain, as needed; he was recommended not to take Tylenol. (*Id.*). Dr. Shah recommended continuing acupuncture physical therapy, and that Mr. Shirey reported being happy with the outcome as he had pain relief and improved range of motion. (Tr. 351, 354-55).

On January 14, 2019, Mr. Shirey presented for a six-month checkup with NP Staci Melvin complaining of pins and needles in his posterior left shoulder. (Tr. 330-31). He was wearing knee braces, but denied falls or having his knees give out. (Tr. 331). His gait was not ataxic and he had

appropriate affect. (Tr. 335). NP Melvin recommended Mr. Shirey finish acupuncture and follow up with Dr. Shah once complete. (Tr. 331-32).

A February 15, 2019 pharmacist's note indicated discontinuing the diclofenac gel due to Mr. Shirey having an adverse reaction. (Tr. 325-26, 329).

On February 25, 2019, Mr. Shirey met with Dr. Shah. (Tr. 321). Notes from this visit indicate Mr. Shirey presented for follow up after physical therapy and use of bilateral knee braces. (*Id.*). The report indicated that physical therapy helped Mr. Shirey's range of motion and relief from his bilateral knee pain. (*Id.*). (However, when calling for the appointment, Mr. Shirey indicated that the acupuncture did not help. (Tr. 351). At that appointment, Mr. Shirey reported his bilateral knee pain was a four on a ten-point scale. (Tr. 323). Dr. Shah noted Mr. Shirey's gait was non-antalgic. (*Id.*). Dr. Shah noted crepitus in both knees. (*Id.*). Anterior drawer, MacMurry's, posterior drawer, varus and valgus stress tests were all negative. (*Id.*). Dr. Shah recommended Mr. Shirey continue acupuncture and physical therapy for his bilateral knees and to consider cortisone injections in the future if conservative treatment fails. (Tr. 324).

On March 12, 2019, Mr. Shirey presented for follow up, noting he had completed physical therapy and acupuncture with no improvement in his pain. (Tr. 544). He had no improvement with diclofenac gel. (*Id.*). He was taking meloxicam daily and using menthol/methyl salicylate topical cream with minimal reduction in pain. (*Id.*). Mr. Shirey rated his pain at a five on a ten-point scale. (Tr. 545). Bilateral shoulder X-rays were normal. (Tr. 546). He was referred for a consult with physical medicine and rehabilitation. (Tr. 546-47).

On March 25, 2019, Dr. Shah performed an EMG test, with abnormal result, showing mild carpal tunnel on the right, and moderate on the left. (Tr. 443-44). There was no evidence of

ulnar entrapment neuropathy bilaterally, left cervical radiculopathy, or bilateral peripheral neuropathy. (*Id.*).

On April 1, 2019, Mr. Shirey met with Dr. Shah, presenting with a non-antalgic gait, but shoulder pain at a seven on the right and eight out of ten on the left. (Tr. 438, 521). Impingement, Hawkins, Phalen, and Tinel tests were positive, but speed and cross arm tests were negative. (*Id.*). His shoulder was restricted in its range of motion, and exhibited a painful arc. (*Id.*). Otherwise, 5/5 motor strength was noted in all muscle groups of the bilateral upper extremities. (*Id.*). Mr. Shirey was recommended to wear bilateral wrist splints. (Tr. 439).

Also on April 1, 2019, Mr. Shirey presented to the physical therapy clinic for bilateral wrist cockup braces. (Tr. 434-35). He was provided with a left wrist cockup splint; the clinic was out of right-handed splints and one was ordered sent to his home. (Tr. 435). Mr. Shirey also requested a new knee brace, which was also sent to his home. (*Id.*).

On April 17, 2019, Mr. Shirey met with Russell Whitemore, M.D. to discuss the result of his MRI and planned treatment for his bilateral shoulder pain. (Tr. 423). The MRI showed some minimal narrowing of the glenohumeral articular cartilage, but no evidence of rotator cuff or labral abnormality. (*Id.*). Mr. Shirey complained of worsening pain in his left shoulder and pain in the right shoulder; he occasionally drops objects from his hand. (Tr. 424). Mr. Shirey previously had a cortisone injection in his left shoulder, but it did not help his pain relief. (*Id.*). At this visit, Mr. Shirey's right shoulder pain was seven out of ten and his left shoulder pain was eight out of ten. (Tr. 425). His gait was non antalgic. (*Id.*). He exhibited positive Phalen and Tinel tests. (Tr. 425-26). Mr. Shirey declined to proceed with needle test on his cervical paraspinal muscles. (Tr. 426). Mr. Shirey was instructed to avoid meloxicam and started on Tylenol 500 mg three times per

12

day; provided with a menthol/methyl salicylate topical cream, instructed to wear bilateral cockup wrist splints, and to continue with physical therapy. (Tr. 427-28). In addition, Dr. Shah noted "[t]here is no indication for surgical intervention no need to consult orthopedic surgeon." (Tr. 429).

On May 1, 2019, Mr. Shirey presented for follow up with a physiatrist, Brijesh Patadia, M.D., after referral for a glenohumeral joint injection. (Tr. 417-21). Mr. Shirey presented with slowed gait. (Tr. 420). An MRI of Mr. Shirey's left shoulder in April of 2019 showed mild osteoarthritis in the glenohumeral joint or possible subscapularis tendonitis. (Tr. 418, 420). However, the acromioclavicular and glenohumeral joints were well-maintained bilaterally. (Tr. 418). There was evidence of mild carpal tunnel syndrome on the right and moderate carpal tunnel syndrome on the left. (Tr. 419). There was no evidence of peripheral neuropathy or left cervical radiculopathy. (*Id.*). There was evidence of brisk reflexes in the bilateral upper extremities and Hoffman's sign in the left. (Tr. 420). In Dr. Patadia's opinion, Mr. Shirey's pain was likely mediated from poor shoulder conditioning, generally protracted posture, and notable scoliosis changes clinically. (*Id.*). Mr. Shirey declined the left glenohumeral joint injection. (*Id.*). Dr. Patadia ordered Neurontin titration and chiropractic intervention to assist with Mr. Shirey's intrascapular and periscapular pain. (Tr. 421). He deferred to Dr. Shah for intervention on the brisk reflexes and Hoffman's sign. (*Id.*).

A spinal imaging from May 6, 2019 showed minimal scoliosis (less than five degrees) at the thoracolumbar junction convex toward the left. (Tr. 502). Mild disc space narrowing with spurring was present within the mid and lower thoracic spine. (Tr. 503). The disc spaces were reasonably

preserved with anterior spurring within the lower thoracic spine and within the lumbar spine, and there was vascular calcification. (Tr. 502).

On June 21, 2019, Mr. Shirey presented to the clinic complaining of left ankle and foot swelling without trauma. (Tr. 616). His bilateral knee braces were checked, but no adjustment was needed. (*Id.*). Mr. Shirey requested a replacement hinged knee brace and a physical therapy consult was ordered for one. (*Id.*). On June 24, 2019, Mr. Shirey again reported left ankle and foot swelling without pain. (Tr. 613). He was recommended to elevate his feet when sitting for long periods of time; if no improvement, will consider compression stockings. (*Id.*). He was also instructed to decrease his salt intake. (*Id.*). A neurology consult was ordered for the paresthesia and brisk reflexes. (*Id.*).

On July 18, 2019, Mr. Shirey had a telehealth appointment with Dr. Veizi. (Tr. 607). Dr. Veizi recounted Mr. Shirey's complaints of upper extremity numbness and tingling, and bilateral shoulder discomfort in the interval since his last visit. (*Id.*). Dr. Veizi reviewed imaging results and Mr. Shirey's symptoms. (Tr. 609). Dr. Veizi indicated Mr. Shirey's symptoms were due to rotator cuff tendinitis or partial tear, and changing biomechanics at the cervicothoracic junction. (*Id.*). Dr. Veizi diagnosed Mr. Shirey with possible tendinitis of bilateral rotator cuffs and median nerve neuritis. (*Id.*). Dr. Veizi recommended anti-inflammatories as needed for flare-ups, and physical therapy to manage the scoliosis progression. (*Id.*). Dr. Veizi stated in his notes: "No need for aggressive treatment as there is no targeted area that'll result in significant improvement of the current baseline symptoms severity." (*Id.*).

On September 13, 2019, Mr. Shirey underwent a compensation and pension examination by Gerald Hopperton, PA-C. (Tr. 596-603). During the examination, PA Hopperton noted pain

14

on examination that does not result in or cause functional loss. (Tr. 597). Mr. Shirey could perform repetitive motions without loss of function or range after three repetitions. (Tr. 598). PA Hopperton noted no significant limitation in functional ability due to pain, weakness, fatiguability, or in coordination with repeated use. (Tr. 598). Mr. Shirey exhibited full strength in all areas during muscle strength testing. (Tr. 598-99). PA Hopperton noted no radicular pain, ankylosis of the spine or neurologic abnormalities on examination. (Tr. 600). PA Hopperton noted intervertebral disc syndrome (and arthritis confirmed with diagnostic testing), but that Mr. Shirey had not experienced any episodes of acute symptoms. (Tr. 600-01). Mr. Shirey does not require an assistive device. (Tr. 600). In PA Hopperton's opinion, Mr. Shirey's neck condition did not impact his ability to work and was more likely than not related to normal age progression. (Tr. 602).

**Chiropractic Care.** Mr. Shirey received chiropractic care from Matthew Gajkowski, D.C. (*See, e.g.*, Tr. 550). At these visits, Dr. Gajkowski noted moderate fixation, restricted motion, and tenderness in bilateral sacroiliac, cervical, thoracic, and lumbosacral regions. (Tr. 550-63). Right straight leg test was positive at 35 degrees; left positive at 40 degrees, and Braggard's and Gaenslen's tests were positive bilaterally. (*Id.*).

Dr. Gajkowski performed acupuncture on October 31, November 5, 14, 19, and 28, and December 5, 12, and 19, 2018, and January 2, 9, and 16, 2019. (Tr. 550-63).

At the visits on November 5 and 28, 2018 and January 2 and 23, 2019, Mr. Shirey noted less low back pain. (Tr. 552, 556, 560, 563). He did not experience much improvement in the mid back. (Tr. 563). At the visits on November 14, 19 and 28, and December 12, 2018, Mr. Shirey complained of discomfort with the acupuncture needles. (Tr. 554-56, 558).

15

At the visits on May 8, 13, 15, 20, and 22, and June 5, 12, 17, 19, 26, 2019, Dr. Gajkowski did not perform acupuncture but provided rehab procedures including range of motion, shoulder stabilization exercises, and thoracic stabilization exercises. (Tr. 564-68, 572-78). By the visit on May 13, 2019, Mr. Shirey reported he was "doing better." (Tr. 565). But one week later, on May 20, 2019, Mr. Shirey reported that "for weeks" he had been getting paresthesias on the right as well as the left. (Tr. 567). On June 5, 2019, Mr. Shirey had palpable right pectoral spasms with a five-pound dumbbell press, but the spasms calmed down by the next visit on June 10. (Tr. 575-76). In Dr. Gajkowski's opinion, Mr. Shirey should be seen by a neurologist. (Tr. 576).

Notes from a visit on June 12, 2019 indicate Mr. Shirey was experiencing daily pain at a five on a ten-point scale, with no change in his pain. (Tr. 577). The paresthesias continued at the June 17, 2019 visit, and included mid-back paresthesias. (Tr. 578). Mr. Shirey had to be careful when reaching with his right arm. (*Id.*). On June 26, 2019, Mr. Shirey expressed concern at weakness in his upper extremity and spasms when reaching for objects. (Tr. 573).

**Neurology.** Mr. Shirey was provided a consult with neurologist Amani Ramahi on July 26, 2019. (Tr. 590-93). Dr. Ramahi noted Mr. Shirey's complaints of pins and needles and hand numbness, worsened when arms are raise and improved when he brings his arms down. (Tr. 592). Dr. Ramahi observed normal gait and no muscle wasting or weakness in the muscles tested, although Mr. Shirey winced during shoulder abduction examination. (Tr. 592). In Dr. Ramahi's opinion, Mr. Shirey's symptoms were most suggestive of myofascial pain syndrome. (Tr. 593). Dr. Ramahi also provided Mr. Shirey with a prescription for amitriptyline. (*Id.*).

## IV. MEDICAL OPINIONS

On March 22, 2019, state agency reviewer Gail Mutchler, M.D., found that Mr. Shirey could lift and/or carry twenty pounds occasionally, ten pounds frequently, and stand and/or walk for a total of six hours and sit for a total of six hours in an eight-hour workday. (Tr. 122-31). Dr. Mutchler further limited Mr. Shirey to no climbing of ladders, ropes, or scaffolds, and to avoid concentrated exposures to hazards, including no unprotected heights, given his reduction in overall mobility, and no more than frequently climb ramps/stairs, balance, or crouch, and no more than occasionally stoop, kneel, and crawl. (Tr. 128-29). Dr. Mutchler found that Mr. Shirey required a sit/stand option, one hour maximum interval, separated by a minimum interval of one-half hour without the need to leave the workstation. (Tr. 128).

On July 23, 2019, state agency reviewer Elizabeth Das, M.D., found that the prior administrative medical findings were consistent and supported by the initial level documentation. (Tr. 140). Dr. Das found Mr. Shirey could lift and/or carry twenty pounds occasionally, ten pounds frequently, and stand and/or walk for a total of six hours and sit for a total of six hours in an eight-hour workday (Tr. 138-40). Dr. Das found that Mr. Shirey should avoid concentrated exposure to hazards, never climb ladders/ropes/scaffolds, no more than frequently balance or crouch, and no more than occasionally climb ramps/stairs, stoop, kneel, and crawl (*Id.*). Dr. Das did not indicate Mr. Shirey required a sit/stand option. (*See id.*).

## V.   OTHER RELEVANT EVIDENCE

On January 22, 2019, the Department of Veteran's Affairs issued a decision on Mr. Shirey's benefits, finding Mr. Shirey had a disability rating evaluation of sixty percent. (Tr. 208). This evaluation was based on his left and right knee chondrocalcinosis, degenerative arthritis of the spine with intervertebral disc syndrome, tinnitus, and right perforated eardrum. (*Id.*). On

February 13, 2019, Mr. Shirey was found to have a disability rating evaluation of eighty percent for his left and right lower radiculopathy, sciatic nerve. (Tr. 223).

## THE ALJ'S DECISION

The ALJ's decision, dated April 13, 2020, included the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through December 31, 2023.

2.  The claimant has not engaged in substantial gainful activity since July 30, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.  The claimant has the following severe impairments: patellofemoral syndrome of the knees bilaterally, carpal tunnel syndrome, cervical degenerative disc disease, and left shoulder degenerative joint disease (20 CFR 404.1520(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5.  After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he can never climb ladders, ropes, or scaffolds but he can occasionally climb ramps and stairs. He can frequently balance and crouch, but only occasionally stoop, kneel, and crawl. The claimant can occasionally reach overhead bilaterally. He can frequently handle and finger bilaterally. The claimant must avoid workplace hazards, such as unprotected heights or exposure to dangerous moving machinery.

6.  The claimant is capable of performing past relevant work as an office manager, finance manager, and account specialist. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.      The claimant has not been under a disability, as defined in the Social Security Act, from July 30, 2018, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 84-90).

STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

In determining whether the Commissioner's findings are supported by substantial evidence, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is so because there is a "zone of choice" within which the Commissioner can act, without fear of court interference.

*Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

However, "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Social Security*, 531 F. App'x 636, 641 (6th Cir. 2013) (cleaned up).

A district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted). Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not observe its own procedures and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Mr. Shirey brings three challenges for review.[1] First, he maintains that because former Commissioner Andrew Saul's appointment as head of the Social Security Administration (SSA)

---

[1] Contained within Mr. Shirey's three main arguments are an amalgam of perfunctory sub-arguments, made without reference to the five-step sequential evaluation process. I therefore have re-organized the argument for ease of evaluation against the five-step sequential

was unconstitutional, the "SSA's structure is also unconstitutional," thus rendering ALJ Shinn's decision in his case constitutionally defective. (Pl.'s Br., ECF #14, PageID 737). Second, Mr. Shirey argues the ALJ failed to evaluate the evidence properly and failed to support the finding that Mr. Shirey had a light RFC. (*Id.* at PageID 738). Finally, Mr. Shirey argues the ALJ violated SSR 16-3p and failed to include his symptoms in the RFC determination. (*Id.* at PageID 748). I address each argument in turn.

## I.    Mr. Shirey's constitutional challenge fails.

Mr. Shirey first contends that remand is required because former Commissioner Saul was appointed as the head of the SSA in violation of the separation of powers. (*Id.* at PageID 737-38). The Commissioner agrees the provisions limiting the President's removal authority in 42 U.S.C. § 902(a)(3), under which former Commissioner Saul was appointed, violate the separation of powers. (Comm'r's Br., ECF #16-1, PageID 764-65). But, without more, Mr. Shirey's constitutional challenge fails because he has not shown how a limitation on the President's ability to remove former Commissioner Saul caused him harm when ALJ Shinn issued an unfavorable decision in his case.

### A.    Threshold considerations

As a threshold matter, I conclude Mr. Shirey has not forfeited his ability to raise his constitutional challenge despite not first raising the issue during the administrative proceedings. (*See* Pl.'s Br., ECF #14, PageID 738). In *Carr v. Saul*, 141 S. Ct. 1352 (2021), the Supreme Court

---

evaluation and discuss Mr. Shirey's claims as I can best comprehend them. All arguments not discussed are deemed waived because they were not fairly presented for review. *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) (noting that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

held a claimant does not need to exhaust a constitutional claim at the administrative level, but instead may present such a claim for the first time at the district court level. *Id.* at 1362. However, this rule does not change Sixth Circuit precedent (*see Ramsey v. Comm'r of Soc. Sec.*, 973 F.3d 537 (6th Cir. 2020)), nor does it change the claimant's requirement to raise the issue in the opening brief or else waive the claim. *Kathrine R. v. Kijakazi*, No. 2:19-CV-00334-FVS, 2021 WL 3854431, at *3-4 (E.D. Wash. Aug. 27, 2021) (finding that *Carr* did not change existing precedent that claimant could have, but did not, raise an Appointments Clause claim in her opening brief, and thus declining to amend or alter judgment).

However, I note that Mr. Shirey's Complaint in this Court does not include reference to any constitutional challenges. (ECF #1). Rule 8(a)(2) of the Federal Rules of Civil Procedure provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." A complaint need not provide "detailed factual allegations," but at a minimum, a complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Mr. Shirey grounds his constitutional claim in *Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020), decided in June 2020, but failed to give notice of the claim when he filed his Complaint in January 2021. Accordingly, his constitutional claim—advanced for the first time in his Merits Brief (ECF #14)—is procedurally improper. *See, e.g., Butcher v. Comm'r of Soc. Sec.*, No. 2:20-CV-6081, 2021 WL 6033683, at *6 (S.D. Ohio Dec. 21, 2021), *report and recommendation adopted sub nom. Christina B. v. Comm'r of Soc. Sec.*, 2022 WL 523519 (S.D. Ohio Feb. 22, 2022).

    **B.**    **Mr. Shirey has not shown compensable harm flowing from former Commissioner Saul's appointment.**

Despite the procedural defects just described, I proceed to the merits of Mr. Shirey's constitutional claim. Andrew Saul became Commissioner of the Social Security Administration on June 17, 2019,[2] pursuant to 42 U.S.C. § 902(a). Section 902(a)(3) provides that "[a]n individual serving in the office of Commissioner may be removed from office only pursuant to a finding by the President of neglect of duty or malfeasance in office." *Id.* The parties agree that portion of § 902(a)(3) violates the separation of powers because it limits the President's authority to remove the Commissioner as the head of an executive agency. (Pl.'s Br., ECF #14, PageID 737; Comm'r's Br., ECF #16-1, PageID 764-65). *See also Seila Law LLC v. Consumer Fin. Prot. Bureau,* 140 S. Ct. 2183, 2191 (2020) (statutory restriction on the President's ability to remove the head of an agency ("for inefficiency, neglect of duty, or malfeasance") violates the separation of powers and is unconstitutional); *see also Collins v. Yellen,* 141 S. Ct. 1761, 1787-89 (2021) (statutory restriction on the President's ability to remove the head of an agency (e.g., "for cause," "neglect of duty, or malfeasance in office") violates the separation of powers and is unconstitutional).

In *Seila Law,* the Supreme Court held the provisions of 12 U.S.C. § 5491(c)(3) allowing the President to remove the Director of the Consumer Financial Protection Bureau (CFPB) only for "inefficiency, neglect of duty, or malfeasance of office," violated the separation of powers doctrine by insulating the director from removal by the President. 140 S. Ct. at 2197. The Court also found that the unconstitutional removal provision was severable from the other provisions of the relevant statute, thereby maintaining the CFPB intact as an agency. *Id.* at 2208, 2211. The Supreme Court did not discuss what a plaintiff must show to obtain relief when challenging actions taken by the

---

[2]     *See Social Security Administration, Executive Bios, Andrew Saul,* http://www.ssa.gov/ ndf/documents/SSA%20Executive%20Bios-11182020.pdf (last visited April 18, 2022).

24

head of an agency who derived powers from a statute that included an unconstitutional removal provision.

The Court has since addressed this issue in *Collins v. Yellen*. There, the Court considered a similar statute governing the removal of Directors of the Federal Housing Finance Agency (FHFA). The majority held that "[a]lthough the statute unconstitutionally limited the President's authority to *remove* the confirmed Directors, there was no constitutional defect in the statutorily prescribed method of appointment to that office. As a result, there is no reason to regard any of the actions taken by FHFA . . . as void." 141 S. Ct. at 1787 (emphasis in original).

The *Collins* Court further found "there is no basis for concluding that any head of the FHFA lacked the authority to carry out the functions of the office" because the removal restriction was unconstitutional. 141 S. Ct. at 1788 ("unlawfulness of the removal provision does not strip the Director of the power to undertake the other responsibilities of his office, including implementing the third amendment") (citing *Seila Law*, 140 S. Ct. at 2207-11). Rather, "to obtain reversal of an agency decision, a plaintiff would need to demonstrate compensable harm flowing from the unconstitutional removal clause." *Id.* at 1788-89. Although "the Constitution automatically displaces any conflicting statutory provision from the moment of the provision's enactment," an unconstitutional statutory provision may yet inflict compensable harm entitling claimants to retrospective relief. *Id.* The Supreme Court offered examples of situations where unconstitutional removal restrictions could inflict compensable harm:

> Suppose, for example, that the President had attempted to remove a Director but was prevented from doing so by a lower court decision holding that he did not have "cause" for removal. Or suppose that the President had made a public statement expressing displeasure with actions taken by a Director and had asserted that he would remove the Director if the status did not stand in the way. In those situations, the statutory provision would clearly cause harm.

25

*Id.* at 1789. Notably, each of these examples require the President to acknowledge being prevented from removing an agency head due to the unconstitutional statutory provision.

Mr. Shirey has made no such allegation in his constitutional argument. As the Commissioner points out, the administrative proceedings in Mr. Shirey's case (and his filing of his Complaint in this Court) concluded while former President Donald Trump was still in office, and before President Joseph Biden's inauguration on January 20, 2021. (Comm'r's Br., ECF #16-1, PageID 771). Therefore, any argument Mr. Shirey makes to show compensable harm flowing from President Biden's inability to remove former Commissioner Saul due to the unconstitutional removal provision fails. (*See* Pl.'s Br., ECF #18, PageID 794).

In this case, the parties disagree as to the effect the unconstitutional removal restriction has on the ALJ's determination of Mr. Shirey's disability application. Mr. Shirey argues Commissioner Saul's appointment violated separation of powers, thereby depriving him of authority to carry out the functions of his office, including delegating authority to ALJ Shinn or to the Appeals Council who determined Mr. Shirey's benefits claim and, therefore, he is entitled to remand for a *de novo* hearing. (Pl.'s Br., ECF #14, PageID 738). The Commissioner disagrees, noting that ALJ Shinn held office under an appointment legally ratified in July 2018 by then-Acting Commissioner Nancy Berryhill. (Comm'r's Br., ECF #12-1, PageID 1760). The Commissioner also asserts that Mr. Shirey has not shown he was affected, much less harmed, by the unconstitutional removal restriction. (*Id.* at PageID 1762-65).

Acting Commissioner Berryhill—who ratified the appointment of ALJ Shinn—was removable at-will and was therefore not subject to § 902(a)(3)'s provision restricting the President's power. (*Id.* at PageID 1760-61). This is fatal to any constitutional claims of harm or entitlement to

relief Mr. Shirey may allege. *See Collins*, 141 S. Ct. at 1781 (because the FHFA removal restrictions only applied to the Director, "any constitutional defect in the provisions restricting the removal of a confirmed Director would not have harmed [the plaintiffs], and they would not be entitled to any relief" from actions of the Acting Director who enjoyed no such removal protections). Section 902(b) confirms there are no removal restrictions for an Acting Commissioner, and thus there is no nexus between Acting Commissioner Berryhill's ratification of ALJ Shinn's appointment and the unconstitutional provisions of § 902(a)(3). As a result, I conclude Mr. Shirey has not shown that Acting Director Berryhill or ALJ Shinn lacked authority to carry out the functions of their respective offices due to the constitutional defect in § 902(a)(3), or that he suffered harm as a result.

Even if former Commissioner Saul had appointed ALJ Shinn, the unconstitutionality of the removal provision did not deprive former Commissioner Saul of the ability to delegate power to others to decide the claim. The doctrine of severability applies where, as the Supreme Court explained in *Seila Law*, "one section of a statute may be repugnant to the Constitution without rendering the whole act void." 140 S. Ct. at 2208. *Seila Law* found the unconstitutional removal provision was severable from the remaining statute because the CFPB was capable of functioning independently even if the provision is stricken. *Id.* at 2209-10.

The same result obtains here, because "[i]f the removal provision in § 902(a)(3) is stricken, the Social Security Administration would remain fully functional." *Butcher*, 2021 WL 6033683, at *7 (citing *Alice A. v. Comm'r of Soc. Sec.*, No. C20-5756, 2021 WL 5514434, *6 (W.D. Wash. Nov. 24, 2021) (finding the plaintiff's separation of powers claim failed, in part, because even if § 902(a)(3) was unconstitutional it was severable from the remainder of the statutes governing the

Social Security Administration)). Moreover, Mr. Shirey's argument that the former Commissioner did not have authority to carry out the functions of office because the removal restriction was unconstitutional was already rejected by the Supreme Court in *Collins*. *See* 141 S. Ct. at 1788. He must still show he suffered compensable harm flowing from the removal clause. *Id.* As discussed above, he has not made any such showing.

For the foregoing reasons, I find Mr. Shirey's separation of powers claim lacks merit. Accordingly, I do not reach the Commissioner's alternative arguments as to harmless error, de facto officer, the rule of necessity, and other prudential considerations. *See, e.g., Cary v. Mox*, No. 17-cv-12862, 2018 WL 4402939, at *10 n.6 (E.D. Mich. Aug. 14, 2018) ("Because Defendants Washington and Leach are entitled to summary judgment on the basis of exhaustion, and in the interest of judicial economy, the Court does not reach their alternative arguments for dismissal or summary judgment."), *report and recommendation adopted*, 2018 WL 4385793 (E.D. Mich. Sep. 14, 2018); *see also Butcher*, No. 2:20-CV-6081, 2021 WL 6033683, at *8 ("Plaintiff's separation of powers claim lacks merit. Accordingly, the Undersigned does not reach the Commissioner's alternative arguments including harmless error, de facto officer, the rule of necessity, and other prudential considerations.").

### C. Mr. Shirey has not pointed to an ambiguous regulation and therefore *Auer* does not apply to his case.

Mr. Shirey also attempts to invoke uncontrolled judicial *Auer* deference as reason for remand, asserting that

> the Commissioner also faced reduced constitutional checks and balances from the Courts. The Commissioner's interpretation of Social Security regulations was given deference by the Courts under *Auer v. Robbins*, 519 U.S. 452 (1997). The Commissioner, therefore, set the rules and then proceeded to dictate how these rules were interpreted. The [SSA] also conducted administrative proceedings to enforce

compliance with its rules and regulations. This was the type of unchecked power *Seila* found unconstitutional.

(Pl.'s Br., ECF #14, PageID 738). The Commissioner's Brief does not address this issue.

*Auer* deference stands for the principle that courts are to defer an agency's reasonable interpretation of its own ambiguous regulations. *Auer*, 519 U.S. at 461-63. An agency's interpretation of its own regulations is controlling unless "plainly erroneous or inconsistent with the regulation." *Id.* (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 359 (1989) (cleaned up)). However, "a court should not afford *Auer* deference unless the regulation is genuinely ambiguous." *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). "If uncertainty does not exist, there is no plausible reason for deference. The regulation then just means what it means—and the court must give it effect, as the court would any law." *Id. Auer* deference does not, however, permit an agency to use ambiguity or post-hoc interpretation to its advantage to create a *de facto* new regulation. *Id.* at 2415, 2417-18.

Aside from making the broad allegation that courts have ceded their role in reviewing administrative agency regulations such that agencies enjoy power unchecked by judicial review, Mr. Shirey has pointed to no regulation requiring review by this Court.[3] (*See* Pl.'s Br., ECF #14, PageID 738). I do not proceed to the merits of any argument against *Auer* deference, which does not apply in this instance. I therefore give the SSA's regulations their effect, as I would any law.

---

[3]     Indeed, in *Kisor*, the Supreme Court "cabined *Auer*'s scope in varied and critical ways—and in exactly that measure, has maintained a strong judicial role in interpreting rules." 139 S.Ct. at 2418.

II.     **Substantial evidence supports the ALJ's determination.**

Couched as an RFC argument, Mr. Shirey brings a number of claims regarding the ALJ's determination as to the severity of his mental health disorder at Steps Two and Three of the sequential evaluation process (Pl.'s Br., ECF #14, PageID 740-41), claims regarding the ALJ's evaluation of his symptoms of pain (*id.* at PageID 742-43), claims regarding the ALJ's RFC determination (*id.* at PageID 743-46), claims regarding the evidence reviewed by the agency reviewing medical experts (*id.* at PageID 744), and claims regarding the ALJ's review of VA determinations (*id.* at PageID 746-48). The Commissioner opposes. (Comm'r's Br., ECF #16-1, PageID 777-86). I address each argument fairly presented in turn below.

### A.     The ALJ did not err in his Step Two evaluation of Mr. Shirey's mental health condition.

Mr. Shirey appears to argue that his mental health condition should have been considered a severe impairment at Step Two of the sequential evaluation process. (Pl.'s Br., ECF #14, PageID 740-41). The Commissioner responds that substantial evidence supports the ALJ's Step Two determination (Comm'r's Br., ECF #16-1, PageID 777-80), and I agree.

DIB claims follow a five-step sequential evaluation process. 20 C.F.R. § 404.1520(a)(4). If a determination can be made at a certain step, the Commissioner will make that determination at that step and will not continue to the next step. *Id.* The central question at Step Two is whether the claimant has a medically determinable impairment or combination of impairments that substantially limits the claimant's ability to perform basic work activities, and that meets the durational requirements of agency regulations. 20 C.F.R. § 404.1520(a)(4)(ii), (c). At Step Two, disability claimants must make a threshold showing that the alleged medically determinable impairments are severe enough to meet the SSA's regulatory standards. *Bowen v. Yuckert*, 482 U.S.

137, 145 (1987). Step Two determinations require claimants to make a *de minimis* showing that their impairment or combination of impairments is severe enough to interfere with their ability to work. *Id.* at 153-54. Although the Step Two threshold is "lenient," claimants still must show that their claim is grounded in medical evidence and affected their ability to work prior to the date last insured. *Higgs*, 880 F.2d at 862-63.

Here, the ALJ found that Mr. Shirey's medically determinable impairment of adjustment disorder with mixed emotional features was nonsevere. (Tr. 85). Even so, the ALJ evaluated Mr. Shirey's adjustment disorder against the four functional areas of understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself. (*Id.*). The ALJ concluded by finding that "[Mr. Shirey's] medically determinable mental impairment causes no more than "mild" limitation in any of the functional areas and the evidence does not otherwise indicate that there is more than a minimal limitation in the claimant's ability to do basic work activities, it is nonsevere." (*Id.*).

Mr. Shirey has made no showing that the severity of his mental health condition meets the requirements found in § 404.1520. Mr. Shirey references one evaluation by a pain psychologist in which he was diagnosed with adjustment disorder with mixed emotional features. (Pl's Br., ECF #14, PageID 739, referencing Tr. 368-72). However, Mr. Shirey has not shown that this diagnosis "significantly limits [his] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). Rather, after receiving this diagnosis, Mr. Shirey declined follow-up with pain psychology and was "ambivalent" about a mental health referral. (Tr. 372). Mr. Shirey indicated he might look into outpatient mental health care, but there are no records indicating he sought or received treatment for his condition. (*See id.*).

I find no error with the ALJ's determination at Step Two.

**B.    The ALJ did not err in his Step Three evaluation of Mr. Shirey's mental health condition.**

Mr. Shirey further appears to argue that the ALJ's evaluation of the functional criteria at Step Two should have led to a Step Three finding that Mr. Shirey met the requirements of a listed impairment. (Pl.'s Br., ECF #14, PageID 740-41, 743). The Commissioner responds that the ALJ's decision was supported by substantial evidence and that Mr. Shirey has not met his burden of production at Steps One through Four. (Comm'r's Br., ECF #16-1, PageID 778-80).

The claimant bears the burden of proof in Steps One through Four, including the burden to demonstrate the claimed impairment meets Listing criteria. *Walters*, 127 F.3d at 529. Claimants can demonstrate they are disabled by presenting medical findings supporting a Listing equivalence. *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2009). However, these medical findings must be "equal in severity to *all* the criteria for the one most similar listed impairment." *Sullivan v. Zebley*, 493 U.S. 521, 531 (1990) (emphasis in original).

In support of his argument that he meets a listed impairment, Mr. Shirey points to a diagnosis of adjustment disorder with mixed emotional features made by pain psychologist Dr. Hutchins-Barker, the VA's determinations of his disability rating, and a diagnosis suggestive of myofascial pain syndrome. (Pl.'s Br., ECF #14, PageID 739-40). Mr. Shirey also describes the general Paragraph B criteria for mental health listings found in Listing 12.00. (*Id.* at PageID 741). However, Mr. Shirey has not connected any mental health impairments with any specific Listing, nor has he shown he overcomes the ALJ's finding of only mild mental impairments at Step Two. I therefore find Mr. Shirey has not carried his Step Three burden.

C.     **The ALJ properly incorporated evidence submitted after the State agency reviewing physicians completed their review.**

Mr. Shirey argues the ALJ erroneously based his light exertion RFC finding on the opinions of the reviewing physicians, who examined Mr. Shirey's case records in March and July 2019, respectively. (Pl.'s Br., ECF #14, PageID 744-45). Mr. Shirey contends the reviewing physicians did not have the opportunity to review all of the evidence; in his view, had the agency reviewers been able to review the evidence dated after July 2019, they would have understood Mr. Shirey was "a person who was incapable of standing/walking the six hours a day as required for work at the light level of exertion." (*Id.*). The Commissioner opposes, stating that substantial evidence supported the ALJ's analysis of the light exertional level, and pointing to the independence of the ALJ's RFC as evidenced by its deviation from the opined limitations of the agency reviewers. (Comm'r's Br., ECF #16-1, PageID 783-86).

As the Sixth Circuit has explained, "[t]here is no categorical requirement that a non-treating source's opinion be based on a 'complete' or 'more detailed and comprehensive' case record. The opinions need only be 'supported by evidence in the case record.'" *Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1002 (6th Cir. 2011) (quoting SSR 96-6p). It stands to reason that, because agency review predates the ALJ's hearing, "[t]here will always be a gap between the time the agency experts review the record and give their opinion . . . and the time the hearing decision is issued." *Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 831 (6th Cir. 2009) (internal quotations omitted). Remand is not warranted "[a]bsent a clear showing that the new evidence renders the prior opinion untenable." *Id.* "If an ALJ's decision includes a discussion of medical opinions or other evidence post-dating the State agency opinions, courts will generally find no error as the ALJ

adequately reviewed the complete case record." *Brown v. Saul*, No. 1:18-CV-1463, 2019 WL

4039055, at *6 (N.D. Ohio Aug. 27, 2019) (collecting cases).

Here, it is clear that the ALJ reviewed the complete case record, including evidence

postdating the State Agency opinions issued in March and July 2019. As discussed throughout this

Report and Recommendation, the ALJ engaged with the evidence in Mr. Shirey's case record and

considered the evidence both in favor of and against a finding of disability. Particular to the dates

in question, the ALJ considered a neurology consultation from July 2019 (Tr. 89), a September

2019 benefit exam (Tr. 90), and a January 2020 check-up. (*Id.*). The ALJ also considered Mr.

Shirey's own testimony from the hearing on April 2, 2020. (Tr. 87). The ALJ's decisions thus

demonstrates an adequate review of the complete case record, up to and including the hearing

date.

Following other courts in this judicial district, I find no error.

**D.    The ALJ's RFC finding is supported by substantial evidence.**

Mr. Shirey argues the ALJ erred in the evaluation of his RFC in violation of SSR 96-8p.

(Pl.'s Br., ECF #14, PageID 746-48). The Commissioner opposes, articulating the specific instances

in which the ALJ considered the evidence Mr. Shirey contends was ignored in the ALJ's RFC

determination. (*Compare id. with* Comm'r's Br., ECF #16-1, PageID 784-85).

The ALJ alone is responsible for determining a plaintiff's RFC. *See* 20 C.F.R.

§ 404.1546(c). The RFC is what an individual can still do despite his limitations. SSR 96-8p. It is

an administrative assessment of the extent to which an individual's impairments and related

symptoms may cause limitations or restrictions that affect her capacity to do work-related activities.

*Id.* An ALJ's RFC assessment must be based on all relevant evidence in the case record and must

include "a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* "In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 744 F. Supp. 2d at 881.

However, certain evidence is not persuasive or valuable in the ALJ's evaluation of an individual's RFC. SSA regulations explicitly provide that disability determinations by other governmental agencies—such as the VA—are not binding on the SSA. 20 C.F.R. §§ 404.1520b(c)(3), 404.1504. The SSA does not require its ALJs to provide an analysis of the other agency's decision. *Id.* at § 404.1504. However, the ALJ is required to consider all of the evidence supporting the other agency's decision received as evidence in the claim. *Id.* Ultimately, however, the ALJ was not required to defer to the VA's determination regarding Mr. Shirey's disabilities.

In his RFC evaluation, the ALJ provided a thorough review of Mr. Shirey's impairments, and considered evidence such as Mr. Shirey's physical therapy evaluations, knee X-rays, psychiatric assessment, chiropractic care, shoulder pain, numbness, and tingling, intermittent gait issues, neurology consult, and medications. (Tr. 87-89). The only medical opinions in the record were those provided by State agency reviewers, which the ALJ found persuasive. (Tr. 89). However, the ALJ found additional limitations were necessary based on his review of the medical evidence:

> The record shows that the claimant had ongoing pain and dysfunction in his knees, neck, and left shoulder, which limited him to light work generally. However, he demonstrated largely normal strength with relatively modest neurological findings. Additionally, he had relatively conservative treatment without the need for invasive

procedures. Accordingly, the evidence supports the finding that the claimant could perform the reduced range of light work that the consultants described, but in considering the claimant's carpal tunnel syndrome, I added additional manipulative limitations. Moreover, the claimant's lower extremity symptoms were consistent with a limitation to occasionally climbing ramps and stairs.

(Tr. 89). The ALJ was not required to analyze the disability ratings provided by the VA, but he did follow the regulations requiring review of the medical findings informing the VA's determination. (*Id.*).

The ALJ summarized his reasoning as follows:

[Mr. Shirey] had ongoing pain in his neck, back, shoulder, and knees, with bilateral carpal tunnel symptoms. Although he had some brisk reflexes, his neurological exam was relatively unremarkable. Moreover, he retained functional strength and generally normal sensation. While the claimant used a cane and he had an antalgic gait at some points, with treatment, his condition appeared to stabilize. Indeed, recent treatment notes did not document the need for an ambulatory aid and he had a generally normal gait. Furthermore, the claimant had a conservative treatment course and he appeared to [get] notable benefit from medications and physical therapy. Such facts suggest that the claimant could perform the reduced range of light work described in the residual functional capacity.

(Tr. 89-90).

Contrary to Mr. Shirey's assertions, the ALJ's decision thoroughly considered the record evidence and includes an RFC crafted specific to Mr. Shirey's impairments. Mr. Shirey has not shown—as is his burden at Step Four—that he meets the requirements for a finding of disability. I therefore decline to recommend remand on this basis.

### III. The ALJ followed SSR 16-3p and did not err in his evaluation of Mr. Shirey's complaints of pain.

As a sub-argument contained within his RFC argument, Mr. Shirey argues the ALJ did not follow the two-step evaluation process when considering his complaints of pain. (Pl.'s Br., ECF #14, PageID 742-43). Mr. Shirey also argues separately that the ALJ erred in considering his

36

symptoms, in violation of SSR 16-3p. (*Id.* at 748-51). The Commissioner opposes, stating that the ALJ properly considered Mr. Shirey's subjective symptoms, and that substantial evidence supports the ALJ's evaluation and determinations. (Comm'r's Br., ECF #16-1, PageID 786-89).

An ALJ follows a two-step process for evaluating an individual's symptoms. First, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. SSR 16-3p. Second, the ALJ evaluates the intensity and persistence of the individual's symptoms and determines the extent to which they limit the individual's ability to perform work-related activities. *Id.* At the second stage, the ALJ considers all relevant evidence, including (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief from pain or other symptoms; (6) any measures other than treatment an individual uses or used to relieve pain or other symptoms; and (7) any other factor concerning an individual's functional limitations and restrictions due to pain and other symptoms. *Id.* The ALJ is not required to analyze all seven factors, but only those factors germane to the alleged symptoms. *See, e.g., Cross v. Comm'r of Soc. Sec.*, 373 F. Supp.2d 724, 733 (N.D. Ohio 2005) ("The ALJ need not analyze all seven factors identified in the regulation but should provide enough assessment to assure a reviewing court that he or she considered all relevant evidence.").

The ALJ is not required to accept the claimant's subjective complaints, and may discount the claimant's subjective testimony when the ALJ finds it inconsistent with objective medical and other evidence. *Jones*, 336 F.3d at 475-76. The ALJ's decision must include "specific reasons for the

weight given to the individual's symptoms" in a "consistent" and "clearly articulated" way, so "any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p. The ALJ need not use any "magic words," so long as it is clear from the decision as a whole why the ALJ reached a specific conclusion. *See Christian v. Comm'r of Soc. Sec.*, No. 3:20-CV-01617, 2021 WL 3410430, at *17 (N.D. Ohio Aug. 4, 2021).

An ALJ's determination of subjective evidence receives great deference on review. *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 714 (6th Cir. 2012). This is because the ALJ has the opportunity to observe a claimant's demeanor during the hearing, something this Court is not afforded in its review. *Jones*, 336 F.3d at 476. Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints or the conclusions drawn from it. *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Here, the ALJ reviewed Mr. Shirey's subjective symptoms—as testified at the hearing and contained in the record evidence—and found Mr. Shirey's symptoms could reasonably be expected to cause his complaints of pain:

> The claimant alleged that he was disabled due to a variety of conditions, including sciatica, bilateral knee impairments, intervertebral disc syndrome, and tinnitus (2E/2). Through his representative, he asserted that he could not sit for long periods and he struggled to use his hands due to carpal tunnel syndrome (4E/7). He also reported that his pain interfered with his concentration and he avoided others (4E/7). He testified that he could stand for only five to ten minutes before his left leg went numb, he could walk for only ten minutes, and he could lift only five pounds (Testimony). He described using a brace on both knees, he slept poorly, and he spent eighty percent of his day in a recliner (Testimony).

(Tr. 87).

However, the ALJ found that "[Mr. Shirey's] statements considering the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (*Id.*). The ALJ then contrasted Mr. Shirey's subjective complaints against findings in the medical record. (Tr. 87-90). Evidence considered by the ALJ included all of the following:

- Mr. Shirey's "normal strength, sensation and gait" despite his complaint of "severe pain in his low back and his hips were numb." (Tr. 87).

- Psychiatric assessment for pain management showing "minor signs of irritation, but normal activity, speech, thought processes, and behavior." (Tr. 87).

- Improvement in physical therapy and discharge to continue with home exercises (Tr. 88).

- Mr. Shirey's "antalgic gait . . . only 3/10 pain, intact sensation and normal strength." (*Id.*).

- Mr. Shirey's complaints of "upper extremity numbness and tingling in addition to shoulder discomfort and neck and back pain" during a pain management exam but that "[h]e displayed normal gait, strength, and reflexes. He was advised to take anti-inflammatory medications for pain flares and to participate in physical therapy." (*Id.*).

- Mr. Shirey's neurology consultation for left upper extremity paresthesia and right arm weakness, but examination showed "normal gait and strength with no motor drift despite some wincing with shoulder abduction." (Tr. 88-89).

- A January 2020 check-up in which Mr. Shirey stated he had stopped certain medications and "was not seeing neurology or pain management because he was not interested in narcotics or steroid injections. He demonstrated normal strength, no edema, intact neurological functioning, and a non-ataxic gait." (Tr. 89).

The ALJ consistently supported these findings with citations to the record. (*See* Tr. 87-89).

Mr. Shirey's contention that "the ALJ failed to articulate any rationale beyond the boilerplate paragraphs finding that [Mr.] Shirey's symptoms were not entirely consistent with the

medical evidence" (Pl.'s Br., ECF #14, PageID 750) is belied by my review of the decision and the record of proceedings. In addition, my review does not suggest the ALJ parsed the record or relied on irrelevant information. (*Id.* at PageID 745). As above, the ALJ provided his rationale for finding Mr. Shirey's symptoms were "only partially consistent with the evidence." (Tr. 89). The ALJ considered Mr. Shirey's subjective symptoms, the medical record and treatment history, and evidence both for and against a finding of disability. In his explanation, the ALJ provided rationale sufficient to show he considered all of the relevant evidence.

I therefore decline to disturb the ALJ's analysis of the subjective evidence on this basis.

## CONCLUSION AND RECOMMENDATION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying disability insurance benefits.

Dated: May 3, 2022

_____
DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge.** *See* **Fed. R. Civ. P. 72(b)(2);** *see also* **28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or**

whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).